No. 17-1467

**UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

_____

*Sharon D. Love,*

**Appellant**

*v.*

*Chartis Property Casualty Company*

**Appellee**

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

_____

**Corrected Opening Brief of Appellant**

_____

**PAUL D. BEKMAN
EMILY C. MALARKEY
BEKMAN, MARDER & ADKINS, LLC
300 West Pratt Street, Suite 450
Baltimore, Maryland 21201
(410) 539-6633
*Attorneys for Appellant Sharon D. Love***

## TABLE OF CONTENTS

Table of Authorities.................................................................. iv

Jurisdictional Statement .......................................................1

Issues Presented For Review ................................................1

Statement of the Case ...........................................................2

Statement of the Facts ..........................................................3

Summary of the Argument..................................................13

Argument ..............................................................................15

    I.    STANDARD OF REVIEW ........................................... 15

    II.    THE CHARTIS POLICIES ONLY EXCLUDE COVERAGE FOR INTENTIONAL ACTS ............................................. 16

        A.    Interpretation of Insurance Contracts ............... 16

        B.    The Chartis Policies' Language ........................... 17

        C.    Any Ambiguity Must Be Resolved Against Chartis ................................................................. 22

    III.    THE DISTRICT COURT CONCEDED THAT, IF THE POLICY ONLY EXCLUDES INTENTIONAL CONDUCT, THEN A TRIABLE ISSUE OF FACT EXISTS REGARDING MR. HUGUELY'S INTENT ....... 26

    IV.    EVEN IF THE EXCLUSION APPLIES TO NON-INTENTIONAL "CRIMINAL" ACTS, MR. HUGUELY'S CONVICTION IS NOT DISPOSITIVE ........................................................ 30

Conclusion...............................................................................39

**Request for Oral Argument** ................................................................ **40**

**Certificate of Compliance** ................................................................ **41**

**Certificate of Service** ........................................................................ **42**

**Addendum (Memorandum Opinion In *State Farm Fire and Casualty Co. v. Huguely et al.,* No. 8:13-cv-03088 DKC (March 20, 2017).** ........................................................................ **43**

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Allstate v. Sparks,* 493 A.2d 1110 (Md. App. 1985) ............................... 28

*Allstate Ins. Co. v. Takeda,* 243 F. Supp. 2d 1100 (D. Haw. 2003) ........ 37

*Bailer v. Erie Ins. Exch.,* 687 A.2d 1375 (Md. 1997)......................... 17, 22

*Brohawn v. Transamerica Ins. Co.,* 347 A.2d 842 (Md. 1975) ............... 33

*Burd v. Sussex Mut. Ins. Co.,* 267 A.2d 7 (N.J. 1970) ................. 30, 36-37

*Cole v. State Farm Mut. Ins. Co.,* 753 A.2d 533 (Md. 2000) ................... 17

*Comm. Union Ins. Co. v. Flagship Marine Servs., Inc.,* 190 F.3d 26 (2d Cir. 1999) ...................................................................................... 20

*Essex v. Commonwealth,* 322 S.E.2d 216 (Va. 1985) ............................. 11

*Garden State Fire & Cas. Co. v. Keefe,* 410 A.2d 718 (N.J. Super. Ct. App. Div. 1980) ...................................................................................... 37

*Hanover Ins. Co. v. Talhouni,* 604 N.E.2d 689 (Mass. 1992) ................ 29

*HSK UnumProvident Corp.,* 2013 WL 5310204 (D. Md. 2013).........19-20

*Huguely v. Commonwealth,* 754 S.E.2d 557 (Va. 2014) .......................... 12

*Illinois Farmers Ins. Co. v. Reed,* 662 N.W.2d 529 (Minn. 2003)........... 36

..................................................................................................................

*Int'l Multifoods Corp. v. Comm. Union Ins. Co.,* 309 F.3d 76 (2d Cir. 2002) ...................................................................................................... 20

*Le Roy v. Kirk*, 277 A.2d 611 (Md. 1971) ............................................... 21

*Mazzaferro v. RLI Ins. Co.,* 50 F.3d 137 (2d Cir. 1995) .......................... 20

*Med. Mut. Liability Ins. Soc. of Md. v. Azzato*, 618 A.2d 274 (Md. App. 1993) ....................................................................................... 25

*Mut. Fire. Marine & Inland Ins. Co. v. Vollmer,* 508 A.2d 130 (Md. 1986)................................................................................ 20

*Nettles v. Evans,* 303 So. 2d 306 (La. Ct. App. 1974) ............................ 30

*Pacific Indem. Co. v. Interstate Fire & Cas. Co.,* 488 A.2d 486 (Md. 1985)........................................................................... 16-17, 19, 22

*Ponthie v. U.S.,* 98 Fed. Cl. 339 (Fed. Cl. 2011) ..................................... 20

*Republic Ins. Co. v. Feidler,* 875 P.2d 187 (Ariz. 1993) .................... 30, 38

*Rullo v. Rullo,* 428 A.2d 1245 (N.H. 1981) ........................................34-35

*Safeco Ins. Co. v. McGrath,* 817 P.2d 861 (Wash. App. 1991) ............... 30

*Seabulk Offshore v. American Home Assur. Co.,* 377 F.3d 408 (4th Cir. 2004) ................................................................................15-16

*State Farm Fire and Casualty Co. v. Huguely et al.,* No. 8:13-cv-03088 DKC (March 20, 2017)....................................................................26-27

*State Farm Fire & Cas. Co. v. Morgan,* 364 S.E.2d 62 (Ga. App. 1988) 29

*Tower Ins. Co. v. Judge,* 840 F. Supp. 679 (D. Minn. 1993) ................... 24

*Utica Mut. Ins. Co. v. Cherry,* 45 A.D.2d 350 (N.Y. App. 1974) ............. 38

*Young v. Brown,* 658 So. 2d 750 (La. Ct. App. 1995)..........................23-24

## **Statutes**

Va. Code § 18.2-32  ..................................................................... 11

**Other**

7A Appleman, *Insurance Law and Practice,* § 4492.02 (1979).............. 28

Restatement (Second) of Judgments § 85................................................ 34

11 Williston on Contracts § 32:5 (4th ed. May 2017 update) .................. 19

## JURISDICTIONAL STATEMENT

This appeal is taken from judgment entered on a motion for summary judgment.  Jurisdiction in the District Court existed under 28 U.S.C. §§ 1332 given the parties diversity of citizenship.  On April 10, 2017, Appellant noted a timely appeal from that Court's entry of final judgment, which disposed of all of Appellant's claims. This Court accordingly has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

I.  **DID THE DISTRICT COURT CORRECTLY INTERPRET THE CHARTIS INSURANCE POLICIES TO EXCLUDE ANY CRIMINAL CONDUCT, REGARDLESS OF THE INSURED'S INTENT, WHEN THE POLICIES CLEARLY CONTEMPLATE AN EXCLUSION FOR INTENTIONAL CONDUCT ONLY?**

II.  **DID THE DISTRICT COURT USURP THE ROLE OF THE CIVIL WRONGFUL DEATH JURY AND IGNORE WELL-SETTLED LAW WHEN IT DETERMINED THAT GEORGE W. HUGUELY V'S CRIMINAL CONVICTION TRIGGERED THE INSURANCE POLICY EXCLUSIONS AS A MATTER OF LAW?**

## STATEMENT OF THE CASE

This is an appeal from an order granting summary judgment in favor of Appellee, Chartis Property Casualty Company (Chartis). The underlying lawsuit filed in the U.S. District Court for the District of Maryland is an action for declaratory judgment in which Chartis sought a declaration that it was not obligated to defend or indemnify its insured, George W. Huguely V in relation to a wrongful death lawsuit brought by Appellant Sharon D. Love against Mr. Huguely in the Circuit Court for the City of Charlottesville, Virginia. Chartis named Mrs. Love as an Interested Party in its declaratory judgment action.[1]

The District Court determined that, as a matter of law, the conduct alleged to have been perpetrated by Mr. Huguely in the Virginia wrongful death lawsuit was not covered pursuant to exclusions contained in the Chartis insurance policies, and therefore, that Chartis was entitled to summary judgment. Specifically, the Court held that Mr. Huguely's

---

[1] Chartis also named as Interested Parties Mr. Huguely's mother, Marta Murphy, and her husband, Andrew Murphy, both of whom were policy holders of the Chartis insurance policies at issue. The Murphys have not appealed the decision of the District Court and are therefore not parties to this Appeal.

criminal conviction for second degree murder precluded a jury question on whether an exclusion for "intentional" acts applies.[2]

This timely appeal followed.

## STATEMENT OF FACTS

### *Yeardley Love's Death*

In May of 2010, George W. Huguely V and Yeardley Love were seniors at the University of Virginia. Both were Division I lacrosse players and had been involved in an "on again, off again" relationship for several years. JA 648. Their relationship was at times volatile. JA 397; 648-49. By the spring of 2010, Miss Love had ended the relationship, but the two saw one another and spoke regularly. JA 397-400; 602; 624-25; 648.

On the night of Sunday, May 2, 2010, after drinking for over 24 hours non-stop, a highly intoxicated Mr. Huguely, who was distraught over the state of his relationship with Miss Love even though the two had

---

[2] Because it granted summary judgment on these grounds, the District Court did not reach the second issue raised by Chartis's motion for summary judgment: whether Mr. Huguely's decision to invoke his Fifth Amendment right not to testify against himself violated the insurance contracts' "duty to cooperate" clauses.

been seen at a bar the previous night holding hands, went to her apartment to talk.  JA 117; 389; 400; 598; 604-05.

Mr. Huguely admits that Miss Love did not want to talk to him and that he kicked her door down to gain entry.  JA 117; 389; 616; 618. In a videotaped statement given to the police the next morning, he stated that he was involved in an emotional conversation with Miss Love in her bedroom, and that at one point, Miss Love banged her own head into her bedroom wall.  JA 599.  He denied that he ever struck her, although he admitted that they did "wrestle" on the ground.  JA 389; 599-600; 605; 614; 630-31.  According to Mr. Huguely, he noticed that her nose was bleeding while they were wrestling. JA 389; 600-01; 609; 631.  He stated that he then "tossed" her onto her bed and left her apartment.  JA 389; 609; 632.

According to Mr. Huguely, Miss Love was alive and fine when he left her apartment.  JA 632; 643.  When her roommates returned to the apartment shortly after 2:00 a.m., however, they found Miss Love unresponsive in her bed.  JA 390; 650.  They thought that she was suffering from alcohol poisoning and called 911.  JA 390; 401-02; 650. Paramedics who arrived attempted to resuscitate her, but she was

pronounced dead.  *Id.*  Her only physical injuries were bruised and swollen eye, a small amount of dried blood on her nose and mouth, and an abrasion under her chin.  JA 401.  There were no signs of an altercation in the bedroom, and a witness in the apartment below Miss Love's did not hear any yelling or signs of a struggle.  JA 402-03.

George Huguely was taken into police custody the next morning around 7:00 a.m.  JA 402.  After waiving his Miranda rights, he gave a lengthy videotaped statement to the police.  JA 402; 592-646.  At no point did he seem to know that Miss Love was dead.   To the contrary, when the police finally told him that she *was* in fact dead, he appeared shocked, cried, and refused to believe it.  JA 390; 635-46 ("How is she dead?"  … "She's dead?" … "I don't believe that she's dead." … "There's no way she's dead.  She's not dead.").  He told the police that he could not possibly have done anything to cause her death.  *See id.* ("I didn't, I didn't, I didn't I didn't hurt her;" "I never did anything to her that she could be dead." … "I refuse to believe that she's dead because there's no way that anything that happened last night could kill her.")

### *Mr. Huguely's Alcohol Consumption on May 1 and May 2, 2010*

Since the fateful night of May 2, 2010, a wealth of evidence has been amassed proving that Mr. Huguely was beyond intoxicated when he entered Miss Love's bedroom to talk that evening. In fact, Mr. Huguely had been struggling with alcohol dependence for quite some time, and would drink to intoxication at least four times per week. JA 396; 648-49. His friends had recently staged an intervention because they were concerned about his drinking. JA 396-97. Consistent with this pattern, in the more than 24-hour period before Miss Love's death, Mr. Huguely was drinking heavily and non-stop, with estimates of the number of drinks ranging from 45 to more than 50 drinks between dinnertime Saturday evening and just before midnight Sunday. JA 529; 652.

The day before his altercation with Miss Love, Saturday, May 1, 2010, was Mr. Huguely's final lacrosse game at the University of Virginia. JA 649. He began drinking after the game in his apartment. *Id.* Later that evening, he went to dinner with his parents, during which time his father and mother witnessed him drinking multiple beers during the cocktail hour, and glasses of wine and shots of pure grain alcohol from a flask during dinner. JA 504-05; 516-17; 649.

After dinner, Mr. Huguely, his parents and his aunt went to a local bar named Boylan Heights, where he continued to drink beer, mixed drinks, and shots. JA 493; 649. By the time he left Boylan Heights around 12:30 a.m. Sunday morning, he was very drunk. He continued to drink beer in his apartment and had a hard time getting into his mouth scrambled eggs that his mother had made him. JA 494.

Mr. Huguely continued to drink the next day. His roommate and the roommate's girlfriend testified that they saw him at home drinking beer and acting drunk as early as 9:00 a.m. JA 392; 649-50. When his father picked him up to take him to a father-son golf tournament, he drank on the drive and packed more than 20 beers for the golf course. JA 392; 504; 649-50. By 11:00 a.m., one of his teammates saw him with "glossy eyes" in the parking lot of the golf course, and another stated that he was "clearly still fairly drunk from the night before." JA 392. Teammates and Mr. Huguely's father have testified that he drank beer all day long on the golf course, and that by the 16th hole, he was falling asleep in the cart and was unable to fully participate. JA 392; 504; 649-50.

At a reception in the golf clubhouse Sunday evening, Mr. Huguely's teammates and parents continued to observe him drinking wine. He could not walk straight and was slurring his words, interrupting people, and telling incoherent stories and inappropriate jokes. JA 393; 649-50. After the reception, he went to dinner with his parents, where he continued to drink wine and actually dropped a bottle of wine, creating a scene. *Id.* The group ended their dinner early because they were embarrassed by his behavior. JA 393. When he left the restaurant, Mr. Huguely urinated in public on an outside wall of the restaurant. JA 393; 650.

On the drive home with his father, Mr. Huguely got into a dispute regarding a stock brokerage account being given to him as a graduation gift. JA 504; 650 Once home in his apartment, witnesses observed that he was "frustrated and nonsensical," and was even "a little more out of it than he seemed even at dinner." JA 394. He was upset but could not articulate what had happened with his father. JA 394; 650. He continued drinking in his apartment. JA 619. He left his apartment around 11:45 to go to Miss Love's, and when he returned approximately 30 minutes later, he was still "really, really drunk." JA 395.

Based on all of this evidence, expert witnesses retained by Mr. Huguely in connection with his criminal appellate proceedings, and by the Loves in the wrongful death suit and instant action, opine that Mr. Huguely's alcohol consumption prevented him from having any awareness of his conduct and precluded him from forming an intent to harm Miss Love on the night of Sunday, May 2. Michael Hendricks, Ph.D., a clinical psychologist, and Joseph Saady, Ph.D., a toxicologist, both experts retained by Mr. Huguely, have opined that Mr. Huguely consumed approximately 45 drinks in the 30 hours leading up to his altercation with Miss Love, rendering his BAC between 0.37 and 0.38% at the time he entered her apartment. JA 521; 528. They have opined that such a BAC would have resulted in severe impairments in coordination, speech, judgment, decision-making, and inability to form a plan or develop intent. Dr. Hendricks states that, at this level of intoxication, Mr. Huguely "at best"

> may have been able to achieve only very basic goals, mostly in response to immediately felt needs. His capacity to effectuate a planned outcome would have been greatly reduced by impairments in his sensory perception, his ability to regulate his mood, his ability to think clearly and coherently, his executive functioning, and his lack of physical coordination.

JA 523-24.

Dr. Saady agrees that, at a BAC of 0.38%, Mr. Huguely likely was experiencing the following symptoms: decreased inhibitions, overconfidence, slowed information processing, increased reaction time, impaired balance, drowsiness, visual problems, impairment of perception, memory and comprehension, mental confusion, dizziness, decreased muscular coordination, balance and staggering issues, slurred speech, exaggerated emotional states, incontinence, and depressed reflexes.  JA 528-29.

Jeffrey Aaron, Ph.D., a psychologist retained by Mr. Huguely, has similarly asserted that his "severe intoxication" and "general deficits in impulse control" impaired him "to the degree that his ability to fully comprehend the nature of his actions or their consequences was limited," and he was "precluded [from having a] full appreciation of the nature of his conduct and its consequences."  JA 508-09.

Similarly, Neil Blumberg, M.D., a forensic psychiatrist retained by Appellant, opines that Mr. Huguely was in a state of "alcoholic blackout" at the time of the events, and was

so intoxicated that he lacked the capacity to form the specific intent to hurt Ms. Love and that he was so intoxicated that he lacked the capacity to be aware that he was committing any crime. Mr. Huguely was so intoxicated shortly before Ms. Love's death that he lacked the capacity to recognize that kicking the door, forcing a conversation with her or wrestling with her was wrong and/or illegal.

JA 652.

## *Criminal and Civil Litigation Arising From Yeardley Love's Death*

This court case is one of several involving the premature death of Yeardley Love. The first case was the criminal prosecution of Mr. Huguely, who was arrested the morning of Monday, May 3, 2010, several hours after leaving Miss Love's apartment. After a 14-day jury trial, a Charlottesville jury found him guilty of second-degree murder.[3] Mr. Huguely initiated appellate proceedings that resulted in his conviction being affirmed. The Supreme Court of the United States has denied his

---

[3] Under Virginia law, second degree murder does not require premeditation, but unlike manslaughter, does require "malice." *See* Va. Code § 18.2-32; *Essex v. Commonwealth,* 322 S.E.2d 216, 219 (Va. 1985). The trial court's jury instruction regarding what constitutes "malice" is a subject raised in Mr. Huguely's appellate proceedings and petition for a writ of habeas corpus. JA 392 ("Love's death had been tragic but clearly not intentional"); JA 420-27; 449-57; *Huguely v. Commonwealth,* 754 S.E.2d 557 (Va. 2014).

petition for a writ of certiorari, but he has filed a Petition for Writ of Habeas Corpus with the Circuit Court for the City of Charlottesville, which is still pending.  JA 384-532.

While Mr. Huguely's appellate criminal proceedings were still underway, Yeardley Love's surviving mother Sharon D. Love and her sister Lexie Love filed a wrongful death action against Mr. Huguely in Virginia state court, asserting alternately that Mr. Huguely's negligence and/or intentional conduct caused Miss Love's death, and that he was liable to them under Virginia tort law.  JA 116-127/533-544.

The third lawsuit is the one that gives rise to this Appeal.  Appellee (plaintiff below), Chartis Property Casualty Company (Chartis) is an insurance company that issued a Homeowners liability insurance policy and an Excess liability policy to Mr. Huguely's stepfather and mother, Andrew and Marta Murphy.  Although Chartis is providing a defense to Mr. Huguely in the Virginia wrongful death case, in the meantime, it instituted the underlying declaratory judgment action in the U.S. District Court for the District of Maryland seeking a declaration that the

tortious conduct asserted in that wrongful death case is not covered by either the Homeowners or Excess Policies.[4]  JA 12-44.

Chartis then moved for summary judgment, claiming that it was not obligated to defend or indemnify Mr. Huguely based on the plain language of its insurance policies.  JA 45-51.  After the Court ordered additional briefing and held a hearing (JA 714-21; 752-893), it granted the motion for summary judgment, and issued a declaration that Chartis had no duty to defend or indemnify Huguely in the Virginia wrongful death case.  JA 894-931.

This timely appeal followed, and is brought by Interested Party Sharon D. Love only.   JA 932.

## SUMMARY OF THE ARGUMENT

The District Court erred in interpreting the Chartis insurance contracts to exclude coverage for the actions George W. Huguely V is alleged to have perpetrated in the Virginia wrongful death suit.  Under the clear and unambiguous language of the policies, only conduct that is intentional – not negligent – is excluded from coverage.  Because Mr.

---

[4] The civil wrongful death action has been stayed pending resolution of Chartis's motions for summary judgment in this insurance coverage dispute action.  Trial is scheduled to begin July 30, 2018.

Huguely is alleged to have acted negligently in the wrongful death case, Chartis has an obligation to defend and indemnify him. To the extent there is any ambiguity regarding the nature of the excluded conduct, the ambiguity must be resolved in favor of the insured, and the issue submitted to the finder of fact.

Further, because there *is* a dispute of fact surrounding whether Mr. Huguely acted negligently or intentionally, summary judgment is not appropriate. Indeed, the District Court acknowledged that such a dispute exists inasmuch as it *denied* summary judgment in a companion declaratory judgment action filed by State Farm Insurance Company arising out of a different homeowners' policy issued to Mr. Huguely's parents. In so finding, the Court conceded that the Loves are entitled to present evidence that Mr. Huguely – who had consumed well over 40 alcoholic beverages in the 30-some hour period before his altercation with Miss Love, giving him a Blood Alcohol Content of over 0.37% and rendering him unable to recall with specificity the events of that night – was so intoxicated that he could not have understood the nature of his conduct or acted with the requisite subjective intent to harm Miss Love.

Finally, even if the exclusions are read to apply to unintentional, yet criminal, conduct, summary judgment still was not appropriate. The law is well-settled that a criminal conviction may <u>not</u> be used to legally preclude and estop a subsequent civil litigant from presenting evidence that an insured was merely negligent. Although the District Court acknowledged this principle, its ruling paradoxically did just the opposite. That is to say, while the Court properly held that Mr. Huguely's conviction may be *admissible* evidence in the civil wrongful death trial, its decision granting summary judgment had the effect of determining that the conviction was *dispositive*.

For these reasons, the lower court's ruling should be reversed.

## ARGUMENT

### I.    STANDARD OF REVIEW

Because this is an appeal from an order granting a motion for summary judgment, this Court must perform a *de novo* review. *Seabulk Offshore v. American Home Assur. Co.,* 377 F.3d 408, 418 (4th Cir. 2004). The goal of the review is to determine whether the lower court was legally correct both in its interpretation of the Chartis insurance contracts at issue, and in its determination that there was no dispute of material fact

regarding the application of that interpretation. *See id.* ("We also review de novo a district court's decision on an issue of contract interpretation.").

## II. THE CHARTIS POLICIES ONLY EXCLUDE COVERAGE FOR INTENTIONAL ACTS

A close review of the Chartis insurance policy language does not support the District Court's finding that the exclusions apply to all criminal acts, regardless of whether those acts were intentional. Reviewing the policies' language as a whole – instead of simply cherry-picking the word "criminal" from the documents – compels the conclusion that the policies intended to exclude *intentional* acts only. Stated another way, acts of negligence – whether or not they also constitute a crime – are not excluded from coverage.

### A.    Interpretation of Insurance Contracts

As is true with any contract, the goal of interpreting an insurance contract is to determine the intent of the parties who entered into it. *See Pacific Indem. Co. v. Interstate Fire & Cas. Co.,* 488 A.2d 486, 488 (Md. 1985). The court must start by looking to the terms of the contract itself. *Cole v. State Farm Mut. Ins. Co.,* 753 A.2d 533, 537 (Md. 2000). The words should be given their "customary, ordinary, and accepted

16

meaning," *see id.,* and the document must be construed "as a whole." *Pacific Indem.,* 488 A.2d. at 488.

Extrinsic evidence is only admissible if the terms of the contract are ambiguous*, i.e.,* if their terms are susceptible to more than one meaning as interpreted by a reasonable person.  *Cole,* 753 A.2d at 537; *Pacific Indem.,* 488 A.2d at 489.  Any ambiguities that cannot be resolved through the presentation of extrinsic evidence must be resolved against the party that drafted the contract, ordinarily, the insurance company. *See Pacific Indem.,* 488 A.2d at 497; *see also Bailer v. Erie Ins. Exch.,* 687 A.2d 1375, 1378 (Md. 1997).

### B.    The Chartis Policies' Language

Although Chartis and the District Court perceived this case as one involving a stand-alone "criminal acts" exclusion, in reality, there is no such exclusion in either the Homeowners' or the Excess Policy.  To the contrary, the language of both policies is clear that "criminal acts" are part and parcel of the "intentional acts" exclusion, and that, as such, criminal conduct also must be intentional in order to fall within the exclusions.

The "Intentional Acts" exclusions in the Homeowners' and Excess Policies are very similar, but not exactly the same.   The Homeowners' Policy excludes coverage for:

> 17.   *Intentional Acts*
>
> Personal injury or property damage resulting from any *criminal, willful, intentional or malicious act* or omission by any person.  We also will not cover claims for acts or omissions of any person which are *intended* to result in, or would be expected to result in, or would be *expected* by a reasonable person to cause, property damage or personal injury.  This exclusion applies even if the injury or damage is of a different kind or degree, or is sustained by a different person, than *expected or intended*. …

JA 146 (bold in original omitted; italics and underline added).

The Excess Policy similarly excludes any:

> 8.   *Intentional Act*
>
> *Arising out of any criminal, willful, fraudulent, dishonest, intentional or malicious act* or omission by any person … We also will not cover claims for acts or omissions of any person which are *intended* to result in, or would be *expected* by a reasonable person to cause, property damage or personal injury.
>
> This exclusion applies even if the injury or damage is of a different kind or degree, or is sustained by a different person, than *expected or intended*. …

JA 254 (bold in original omitted; italics and underline added).

Both of these "Intentional Act" exclusions clearly are only intended to apply to intentional conduct. Indeed, the exclusions start with the heading "**Intentional Acts**," evidencing an intent that what follows underneath that heading is an exclusion for intentional conduct. It is a well-recognized tenant of contract interpretation that headings and captions are to be given effect in deciding the contract's intent. To that end, Williston's on Contracts states that "[t]o the extent possible … every word, phrase or term of a contract must be given effect," unless the parties specifically manifest a contrary intent. 11 Williston on Contracts § 32:5 (4th ed. May 2017 update). *See also Pacific Indem.,* 488 A.2d. at 488 (contract must be construed as a whole).

Headings are often used to interpret the meaning of a contract. For example, in *HSK UnumProvident Corp.,* 2013 WL 5310204 (D. Md. 2013), the District Court, in interpreting a health insurance contract, rejected the defendant's argument that the court should "overlook" the heading, which it argued was more limited than the contract provision that followed. The Court explained: "[a]lthough the caption is followed by more general language …. this language is limited by the caption. To

interpret the contract otherwise would be to disregard a meaningful part of the language of the writing, a result abhorred by the Court of Appeals of Maryland." *Id.* at *3 (Quotation marks and citations omitted.).  The Court also relied on the fact that the Maryland legislature "gives significance to captions in insurance policies," citing Md. Code, Ins. § 15-202(d), which requires health insurance policies to include captions.  "The Maryland legislature's regulation of captions suggests that captions are important and that they inform the meaning of the provisions that follow." *Id.  See also Mut. Fire. Marine & Inland Ins. Co. v. Vollmer,* 508 A.2d 130, 134 (Md. 1986) (using headings, in part, to interpret meaning of contract); *Comm. Union Ins. Co. v. Flagship Marine Servs., Inc.,* 190 F.3d 26, 31 (2d Cir. 1999) (same); *Int'l Multifoods Corp. v. Comm. Union Ins. Co.,* 309 F.3d 76, 85 (2d Cir. 2002) ("Captions are relevant to contract interpretation."); *Mazzaferro v. RLI Ins. Co.,* 50 F.3d 137, 140 (2d Cir. 1995) ("A contract of insurance must be read as a whole, including any introductory clause or heading, to determine the intent of the parties."); *Ponthie v. U.S.,* 98 Fed. Cl. 339, 347 (Fed. Cl. 2011) ("When interpreting a contract, a court should attempt to give effect to every word, phrase or term of a contract, including headings.").

Consistent with the heading of the exclusion entitled "Intentional Acts," the description of excluded conduct that follows the headings includes "criminal, willful, malicious, or intentional acts" and acts "which are intended to result in, or would be expected by a reasonable person to cause, property damage or personal injury." "Willful" is a synonym for "intentional;" "malicious" also conveys the "desire to cause harm." *See* www.merriam-webster.com/dictionary/willful (defining "willful" as "done deliberately") and www.merriam-webster.com/dictionary/malicious (defining "malicious" as "having or showing a desire to cause harm to another person"). *See also Le Roy v. Kirk*, 277 A.2d 611, 614-15 (Md. 1971) (interpreting the terms of a will and explaining that, under the maxim *noscitur a sociis*, "the meaning of a word is or may be known from the accompanying words so that, under the rules, general and specific words, capable of analogous meaning, when associated together, take color from each other, so that general words are restricted to a sense analogous to less general").

The only word in the exclusions that possibly could be read *not* to require intentionality is the word "criminal" (for some crimes require intent and others do not). But it is not appropriate to isolate one word

from a complete paragraph and claim that its inclusion changes the intent of the entire rest of the paragraph. It would make no sense, in a list of four words, for one word to be read as having a different meaning than the other three. When read as a whole, as it must be, it is evident that the "Intentional Acts" exclusion from both policies only excludes intentional conduct.

## C.     Any Ambiguity Must Be Resolved Against Chartis

To the extent there is any ambiguity as to whether the inclusion of the solitary word "criminal" in the exclusions means *any* criminal act as opposed to *intentional* criminal acts, that ambiguity must be resolved against Chartis as the drafter.[5] *See Pacific Indem.,* 488 A.2d. at 497, *Bailer,* 687 A.2d at 1378.

This is the conclusion reached by a Louisiana court that considered policy language very similar to that at issue here. In *Young v. Brown,* 658 So. 2d 750 (La. Ct. App. 1995), a man was convicted of a crime associated with shooting an acquaintance in the stomach while he (the shooter) was intoxicated. When the victim sued the shooter in a civil

---

[5] Presumably no extrinsic evidence exists proving the parties' precise intent, and presumably the Murphys did not negotiate or discuss this exclusion before signing the policies.

action, Allstate (the shooter's insurer) disclaimed coverage under an exclusion for "the intentional or criminal acts of an insured person." Just like Chartis here, Allstate asserted that the policy was written in the disjunctive, and that the criminal conviction established as a matter of law the application of the exclusion, even though the shooter claimed it was an accident.

The court disagreed. It pointed out that the criminal code criminalizes a variety of conduct, some of which is perpetrated intentionally, and some of which is not. *Id.* at 753. It held that the policy was subject to more than one meaning, explaining that, because the word "criminal" was "nestled between exclusions for injuries resulting from *intentional* acts and for *intentionally* inflicted injuries, a reasonable purchaser could have understood the basis of the exclusion to be intentional misconduct or intentional criminal acts, thereby allowing coverage for damages resulting from criminal negligence." *Id.* at 754. The court believed that adopting Allstate's interpretation permitting "[a]n exclusion for negligent acts, albeit criminally negligent acts," would be "counter-intuitive to the wording of the exclusion and serve[] to

circumvent the very purpose for which liability insurance is purchased." *Id.*

The court's interpretation of the contract was also premised on policy reasons. It explained that "losses … resulting from negligent, non-intentional conduct are precisely the losses a liability policy buyer expects to insure against," and that the purpose of liability insurance is not just to protect the insureds, but also the general public who may be injured by their conduct. *Id.* at 753-54. *See also Tower Ins. Co. v. Judge,* 840 F. Supp. 679, 692-93 (D. Minn. 1993) (holding, in case involving drunken teenagers who electrocuted their friend and were criminally prosecuted, that insurance policy exclusion for injuries that "result from the criminal acts of an insured" must be interpreted to only apply to intentional criminal acts; stating that "public policy favors a narrow construction of the criminal acts exclusion" and that "it would be bad policy to find that the exclusion applies … just because the state … decided to pursue criminal charges").

In its Memorandum Opinion, the District Court criticized the *Young* decision and cited to a number of cases that reached opposite results. The simple fact, however, is that no Maryland court has had

occasion to consider a similar case. To the extent the District Court believed that *Medical Mutual Liability Insurance Society of Maryland v. Azzato* did, it was mistaken. *Azzato* involved a professional malpractice liability policy that excluded coverage for "dishonest, fraudulent, criminal, or malicious acts" perpetrated in the scope of the professional's practice. 618 A.2d 274 (Md. App. 1993). There was no requirement of intentionality as is present in the Chartis policies at issue here. Additionally, the dishonest and criminal behavior of the insured in that case was not in dispute; the doctor conceded the criminal nature of his conduct by pleading guilty to a crime. George Huguely, however, has repeatedly and hotly contested his responsibility for Yeardley Love's death. His direct criminal appeal and now habeas petition both raise the issue of his actual innocence; Mr. Huguely contends that he did not act with "malice" necessary to commit second degree murder, and that he was too inebriated to understand the nature and consequences of his actions.

Appellant submits that *Young* was correctly decided, and this case should be decided the same way. Any ambiguity regarding the scope of

the word "criminal" should have been resolved in favor of Mr. Huguely and the Loves, and summary judgment denied.

## III.  THE DISTRICT COURT CONCEDED THAT, IF THE POLICY ONLY EXCLUDES INTENTIONAL CONDUCT, THEN A TRIABLE ISSUE OF FACT EXISTS REGARDING MR. HUGUELY'S INTENT

Given that the Chartis policies exclude only intentional conduct, summary judgment was not appropriate.  There exists a hotly contested fact issue surrounding whether Mr. Huguely subjectively intended to harm Miss Love on May 2, 2010.  Indeed, the District Court recognized this factual dispute when it *denied* a summary judgment motion in a companion declaratory judgment case filed by State Farm Insurance Company.  There, the Court held that State Farm was not entitled to summary judgment based on an "intentional acts" exclusion in a homeowners' insurance policy it issued to Mr. Huguely's parents.[6]  *See* Addendum to Appellants' Opening Brief (Memorandum Opinion in *State*

---

[6] The Intentional Act exclusions in the State Farm policy are very similar to the Chartis policy language, with the exception that they do not contain the word "criminal."  They exclude coverage for injuries that are "either expected or intended by the insured" or that are "the result of willful and malicious acts of the insured."  *See* Addendum to Appellant's Opening Brief at 13.

*Farm Fire and Casualty Co. v. Huguely et al.,* No. 8:13-cv-03088 DKC,

March 20, 2017).

In holding that the issue of coverage must be submitted to the fact-

finder in the State Farm case, the Court reasoned:[7]

> Ms. Love has produced an expert witness affidavit
> stating that [Mr. Huguely] was "so intoxicated
> that he lacked the capacity to form the specific
> intent to hurt Yeardley Love" and that he also
> "lacked the capacity to be aware that he was
> committing any crime." The affidavit further
> states that the amount of alcohol [Mr. Huguely]
> had consumed would have resulted in an "inability
> to form a plan or develop an intent" and left him
> "without reason or understanding of the
> consequences of his behavior." Thus, … there is
> clearly a dispute of fact over whether "the risk and
> danger [of his actions] were known or should have
> been known at the time." Appx. p. 18.

The Court's holding in the State Farm case was correct, and should

also have been the holding here. Maryland, like other states, requires a

different level of intent to be shown when applying intentional acts

exclusions in insurance policies than what is required in the criminal

context. To establish the applicability of an intentional acts exclusion,

---

[7] The Court's decision in the State Farm case is included as an
Addendum to this Brief because Chartis did not consent to its inclusion
in the Joint Appendix.

the insurer must show that the insured had the *subjective* intent to harm

the tort plaintiff *and* to cause the actual damages the victim suffered:

> The word "intent" for purposes of tort law and for purposes of exclusionary clauses in insurance policies denotes that the actor desires to cause the consequences of his act or believes that consequences are substantially certain to result from it. In order for an act to be intentional, its consequences must be substantially certain to result as opposed to the feature of wanton acts that the consequences be only probably certain to result....

*Allstate v. Sparks,* 493 A.2d 1110, 1113 (Md. App. 1985) (quoting 7A

Appleman, *Insurance Law and Practice,* § 4492.02 (1979)); *see also* 1112

("insured must have intended the results (damages), not simply the

causing act, for coverage not to apply").

In this case, as the District Court recognized, there is a wealth of

information – much of which was never even introduced during Mr.

Huguely's criminal trial – supporting the Love's contention that it is a

fact issue for the jury to decide whether Mr. Huguely's conduct on the

fateful night of May 2, 2010 was or was not subjectively intentional.

Since his arrest the morning of Yeardley Love's death, George Huguely

has maintained his innocence. Although he admitted to "wrestling" with

Miss Love on the floor of her apartment and "tossing" her into her bed

before leaving, he has always claimed that he did not strike her or perpetrate any purposeful acts that could or would have caused her death.

Furthermore, it is beyond dispute that Mr. Huguely was wildly intoxicated on the night of May 2, 2010, having been drinking heavily for over 24 hours. Numerous experts have concluded that he was simply not capable of understanding the nature and extent of his actions or the impact they might have on others. Especially considering the subjective intent standard, a reasonable jury could surely conclude that the very inebriated Mr. Huguely did not have the requisite intent to injure Miss Love.[8]

---

[8] Many courts have held that an insured's severe intoxication or mental incapacity may render his or her conduct "unintentional" for purposes of an intentional acts exclusion, especially given that some crimes arise out of unintentional conduct (such as negligent homicide, or involuntary manslaughter). One such court has stated that it is in fact the "majority rule" that evidence of voluntary intoxication may be used to establish that an insured did not have the capacity to form the necessary subjective intent for an intentional acts exclusion to apply. *See Hanover Ins. Co. v. Talhouni,* 604 N.E.2d 689, 692 (Mass. 1992) (holding that evidence was sufficient to support conclusion that intoxication with LSD precluded insured from forming intent to assault tort victim). *See also State Farm Fire & Cas. Co. v. Morgan,* 364 S.E.2d 62, 64 (Ga. App. 1988) (holding that 0.25 BAC was sufficient for jury to conclude that insured did not have the capacity to form the necessary intent to shoot and kill tort victim; stating that it is the "majority view … that voluntary

## IV. EVEN IF THE EXCLUSION APPLIES TO NON-INTENTIONAL "CRIMINAL" ACTS, MR. HUGUELY'S CONVICTION IS NOT DISPOSITIVE

Finally, even if the Chartis policies exclude any "criminal" conduct, regardless of whether that conduct was subjectively intentional, summary judgment still was not appropriate. The law is well-settled that

---

intoxication may destroy the capacity to form the intent required to invoke a policy exclusion for acts 'intended or expected' by the insured").

Other similar cases include *Burd v. Sussex Mut. Ins. Co.,* 267 A.2d 7, 15 (N.J. 1970) (rejecting insurance company's contention that insured's conviction for assault and battery arising out of a shooting precluded coverage; explaining that "the critical factual issue was whether the insured was so intoxicated as to be unable to form an intent to commit" the crime); *Republic Ins. Co. v. Feidler,* 875 P.2d 187, 190, 192 (Ariz. 1993) (reversing grant of summary judgment in favor of insurance company, explaining that the "particular mental state required for [the insured] to be convicted of aggravated assault is not conclusive of whether [he] acted with the *different* mental state that would exclude coverage under the intentional act exclusion[;]" "because voluntary intoxication may deprive the insured of the mental capacity necessary to form an intent to injure, an insured can lack an intent to injure for purposes of the policy exclusion but at the same time can commit an aggravated assault"); *Safeco Ins. Co. v. McGrath,* 817 P.2d 861 (Wash. App. 1991) (holding, in shooting case, that whether insured was so intoxicated as to negate his subjective intent for purposes of intentional acts exclusion was a question of fact for the jury); *Nettles v. Evans,* 303 So. 2d 306, 309 (La. Ct. App. 1974) (insurance company did not meet its burden of showing that defendant's conduct in assaulting plaintiff was intentional where the defendant had ingested alcohol and drugs and claimed that he was not in control of himself and did not intend to attack the plaintiff).

a criminal conviction may not be used to estop the plaintiff in a subsequent civil case from proving that the conduct was instead merely negligent.  Rather, although the conviction may be admissible in the subsequent civil case, the civil jury ultimately is not required to accept or agree with it.

The District Court's decision below eviscerated this principle. Although the Court rightly determined that Mr. Huguely's conviction would be admissible in the Love's subsequent civil proceeding, correctly held that the jury in that civil proceeding was not required to accept the conviction, and properly stated that, if Mr. Huguely or the Loves "presented any evidence refuting the conviction," summary judgment must be denied, the Court then paradoxically *granted* summary judgment on the basis of Mr. Huguely's conviction alone.  It reasoned that "[n]either [Mr. Huguely's parents] nor Ms. Love have presented any evidence disputing" the facts underlying Mr. Huguely's conviction."  JA 915-16; *see also* JA 920 ("Defendant's unrebutted criminal conviction provides sufficient evidence that he committed a criminal act … Plaintiff is thus entitled to summary judgment.").

This conclusion makes no sense, and conflicts with the Court's previous recognition that the Loves *did* present evidence from which a reasonable jury could conclude that Mr. Huguely's conduct was not criminal. *See* Appx. to Appellant's Opening Brief p. 18. The Court not only ignored this dispute of fact, but it also ignored a wealth of legal authority holding that the jury in the civil wrongful death case was not bound to accept the conviction, and could conclude, when faced with different evidence than what was adduced at the criminal trial, that Mr. Huguely's conduct was merely negligent. In other words, by deciding that there was no evidence from which a jury could conclude otherwise, the Court effectively usurped the role of the future civil jury, and determined that the conviction alone was dispositive.[9]

No Maryland case has ever adopted the position that a criminal conviction *ipso facto* precludes insurance coverage for tort liability based on the same conduct. To the contrary, the Maryland Court of Appeals

---

[9] The District Court pointed out that voluntary intoxication is not a defense to second degree murder under Virginia law. This fact is irrelevant to the issue in this insurance coverage case. The issues here are what "criminal" means in the context of the Chartis insurance contract, not under the criminal code, and whether there was any evidence upon which a fact-finder could determine that Mr. Huguely's conduct was negligent rather than criminal.

has held that a guilty plea to a criminal charge does <u>not</u> conclusively establish that the conduct was "intentional" for purposes of whether an "intentional act" exclusion in an insurance policy applies. *See Brohawn v. Transamerica Ins. Co.,* 347 A.2d 842, 848 (Md. 1975) (holding, that, although guilty plea is admissible, it "does not conclusively establish the liability" but rather, "may be rebutted or explained in the subsequent civil case").

Regardless of whether the particular exclusion in the insurance policy is an "intentional" or "criminal" act exclusion, if a guilty plea cannot be used to establish the application of an exclusion as a matter of law, then it stands to reason that a contested conviction such as that at issue here surely cannot be so used either.

The majority of jurisdictions are in agreement with *Brohawn* that a criminal conviction – whether by guilty plea or contested trial – does not conclusively establish the applicability of an insurance policy exclusion. Although many of these decisions deal with intentional acts exclusions, they all reason that the civil litigant – who was not present at the criminal trial and had no right to intervene or to present evidence – should not be precluded from presenting a different theory of the case,

based on different evidence, in a civil trial. This principle holds water even if the exclusion is one for non-intentional yet "criminal" acts.

Many of these courts rely on an on-point illustration contained in a comment to the Restatement (Second) of Judgments § 85 ("Effect of Criminal Judgment in Subsequent Civil Action"):

> Illustration 10:
>
> D inflicts a blow on X as a result of which X dies. D is convicted of intentional homicide. P, administrator of X's estate, brings an action against D for wrongful death, alleging D's act was negligent. I had previously issued a policy of liability insurance to D, insuring liability for D's negligent acts but excluding intentional acts. In P's action against D, P is not precluded by the criminal conviction from showing that D's act was negligent rather than intentional.

Restatement (Second) of Judgments § 85, cmt. f, illus. 10.

In one of the most-cited cases on this issue, the Supreme Court of New Hampshire considered an insurance company's argument that, because its insured was convicted of the second-degree murder of her husband, it had no obligation to defend or indemnify her when she was sued for wrongful death by her husband's parents. *See Rullo v. Rullo,* 428 A.2d 1245 (N.H. 1981). The insurance company pointed out – just like the District Court did here – that because intent is a necessary

element of second degree murder under New Hampshire law, she was precluded from re-litigating her liability in the subsequent civil case. *Id.* at 1246.

The court rejected this argument, holding that the issue of negligence was not addressed in the criminal trial, which consisted of different parties with different interests, and that it would be unfair to bind the tort plaintiffs to the evidence adduced at a completely separate proceeding to which they were not a party:

> We adhere to the view that a criminal conviction, where the defendant has not plead guilty, is neither a bar to, nor admissible as evidence to establish the facts on which it was rendered in, a subsequent civil proceeding. To hold otherwise would be to deprive the estate a "full and fair opportunity" to litigate the issue of [the insured's] civil liability. The estate had no opportunity or right to intervene in the criminal case, and unlike the State in a criminal case, it can compel [the insured] to testify. Moreover, at the criminal trial, neither the State nor [the insured] had any standing or any reason to represent the estate's interests or to present the same factual issues concerning civil liability, particularly since [the insured] refuted her guilt[.] … Negligence, in the usual sense, was not an issue in the criminal trial, and we can assume with some confidence that the fact-finder was not concerned with the issue of civil liability.

*Id.* at 1246-47.

The highest court in Minnesota has reached the same conclusion in a declaratory judgment action brought by the insurance company of a day care provider who was convicted of first degree assault in association with severely injuring a child in her care:

> The fact that [the tort plaintiffs] have not had the opportunity to present their case to a court or jury is compelling. The two parties in the criminal prosecution were the State and [the defendant day care provider]. The [tort plaintiffs] were not parties to the criminal proceedings and have not had the opportunity to cross-examine [the defendant day care provider] nor have they had the opportunity to present their own evidence or experts. A Fifth Amendment right not to testify in a criminal proceeding and the negative inference that can be drawn from exercising that right in a civil case may result in substantially different evidence being offered at the civil trial.

*Illinois Farmers Ins. Co. v. Reed,* 662 N.W.2d 529, 533 (Minn. 2003).

Also frequently cited is *Burd, supra.* There, an insurance company argued that, as a matter of law, it was not obligated to pay a verdict rendered against its insured in a civil assault case arising out of a shooting where its insured had been convicted of "atrocious" assault and battery. The Supreme Court of New Jersey held otherwise. Noting that it was the insurance company's burden to prove the applicability of its

exclusion, and the fact that the record suggested that the insured was highly intoxicated at the time of the shooting, the court decided that it "could not say … that the conviction must be accepted as a finding that the injuries were intentionally inflicted within the meaning of the policy." 267 A.2d at 15. It also pointed out that public policy supported the narrowest interpretation of the policy in order to effectuate the "public interest that the victim be compensated." *Id. See also Garden State Fire & Cas. Co. v. Keefe,* 410 A.2d 718, 720 (N.J. Super. Ct. App. Div. 1980) (relying on *Burd* to conclude that a tort victim "is not precluded by the insured's conviction from relitigating the intent issue both because of public policy considerations and because of the lack of mutuality necessary to support application of the doctrine of collateral estoppel").

The rule that criminal convictions cannot be used by insurance companies to collaterally estop their insureds from seeking coverage under exclusions is now well-established across the country. *See, e.g., Allstate Ins. Co. v. Takeda,* 243 F. Supp. 2d 1100, 1109 (D. Haw. 2003) (insurance company could not rely on criminal conviction for first degree assault to estop insured from arguing that he was entitled to coverage; a question of fact surrounded whether the insured acted in self defense);

*Feidler, supra,* 875 P.2d at 190 (conviction for aggravated assault could not be used to estop insured from claiming that he was too intoxicated to have the requisite intent; explaining that "[t]he particular mental state required for [the defendant] to be convicted of aggravated assault is not conclusive of whether [he] acted with the *different* mental state that would exclude coverage"); *Utica Mut. Ins. Co. v. Cherry,* 45 A.D.2d 350 (N.Y. App. 1974) (same; holding that plaintiff in wrongful death action after manslaughter conviction "must be afforded an unfettered opportunity to prove the allegations of … negligence in the complaint").

These same principles apply here regardless of whether the exclusion in the Chartis policies applies to intentional conduct or to criminal conduct, regardless of intent. The Loves were not parties to the criminal case. They did not have the opportunity to present witnesses or evidence, or to argue their theory of the case. Mr. Huguely to this day disputes the validity of his criminal conviction (including that he possessed the requisite intent), and continues his legal battles to overturn it. Under the circumstances, it should be up to a civil jury to determine not only the meaning of the Chartis policies should there be

any ambiguity, but also, whether the conduct alleged to have been perpetrated by Mr. Huguely was criminal or merely negligent.

Summary judgment on the basis of Mr. Huguely's conviction alone was not appropriate.

## CONCLUSION

For all of these reasons, and those to be argued at Oral Argument, Appellant Sharon Love requests that this Court reverse the judgment of the District Court and remand for further proceedings.

_____
Paul D. Bekman
Emily C. Malarkey
BEKMAN, MARDER & ADKINS LLC
300 West Pratt Street, Suite 450
Baltimore, MD 21201
(410) 539-6633
*Attorneys for Appellant*

## <u>REQUEST FOR ORAL ARGUMENT</u>

Appellant hereby requests oral argument pursuant to Local Rule 34(a).

_____
Paul D. Bekman
Emily C. Malarkey
BEKMAN, MARDER & ADKINS LLC
300 West Pratt Street, Suite 450
Baltimore, MD 21201
(410) 539-6633
*Attorneys for Appellant*

## CERTIFICATE OF COMPLIANCE

1.    I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because it contains 8,081 words of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)B)(iii), as verified by Microsoft Word for Mac Version 15.33.

2.    I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Mac Version 15.33 in size 14 Century Schoolbook font.

_____
Paul D. Bekman
Emily C. Malarkey
BEKMAN, MARDER & ADKINS LLC
300 West Pratt Street, Suite 450
Baltimore, MD 21201
(410) 539-6633
*Attorneys for Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of July, 2017, I served

Appellant's Corrected Opening Brief upon the Appellees by electronic

filing and by mailing a copy, first class, postage pre-paid, to:

STACEY ANN MOFFETT
RICHARD BERWANGER JR.
ECCLESTON & WOLF P.C.
7240 Parkway Dr., 4th Floor
Hanover, Maryland 21076
 (410) 752-7474
*Attorneys for Appellee Chartis Property Casualty Company*

_____
Paul D. Bekman
Emily C. Malarkey
BEKMAN, MARDER & ADKINS LLC
300 West Pratt Street, Suite 450
Baltimore, MD 21201
(410) 539-6633
*Attorneys for Appellant*

# **ADDENDUM**

Memorandum Opinion In

*State Farm Fire and Casualty Co. v. Huguely et al.,*

No. 8:13-cv-03088 DKC (March 20, 2017).